## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

PHOENIX ENTERTAINMENT PARTNERS,
LLC, a North Carolina LLC,

      Plaintiff,

v.

HOGBODYS OF NORTH FT. MYERS, LLC,
a Florida Limited Liability Company, and
BONNIE SHAMBURGER, an Individual,

      Defendants.

Case No.: _____

## COMPLAINT AND JURY DEMAND

Plaintiff, Phoenix Entertainment Partners, LLC ("PEP") complains of Defendants,

Hogbodys of North Ft. Myers, LLC ("Hogbodys"), and Bonnie Shamburger ("Shamburger")

(hereinafter collectively referred to as "Defendants") and for its Complaint alleges as follows:

## JURISDICTION AND VENUE

1.     This is an action for trademark infringement and unfair competition arising under

§§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125.  This Court has

exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that

this is a civil action arising under the laws of the United States.

2.     This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this

civil action arises under an Act of Congress relating to trademarks, and, as to PEP's Lanham Act

unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a

substantial and related claim under the trademark laws of the United States.

3.     This Court has supplemental jurisdiction over the subject matter of PEP's state law claims pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to PEP's federal claims that they form part of the same case or controversy.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because Defendants transact business in this judicial district.

5.     This Court has personal jurisdiction over Defendants, in that Defendants conduct significant business in this State and federal judicial district, and the acts and events giving rise to this lawsuit of which the Defendants stand accused were undertaken in this State and federal judicial district.

## THE PLAINTIFF

6.     Plaintiff PEP is a North Carolina LLC having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

7.     Defendant Hogbodys is a Florida Limited Liability Company that operates an establishment called Hogbody's Bar and Grill, with its principal location at 10440 Bayshore Road, North Fort Myers, FL 33917. Hogbodys operates a commercial establishment that provides karaoke entertainment to its patrons as an inducement for their patronage and purchase of food, drink, and other concessions.

8.     Defendant Shamburger is an individual that does business as a karaoke jokey and has provided karaoke entertainment to Hogbodys. Shamburger promotes and advertises her karaoke entertainment services through her Facebook page located at, http://www.facebook.com/bshamburger1/about?ref=br_tf#!/bshamburger1.   Shamburger also promotes her services under the name "Bonnie & Friends."   Shamburger also uses the email

address shamburger4@yahoo.com.   On information and belief, Shamburger resides within this judicial district.

## BACKGROUND FACTS

9.      Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

10.     The basic premise of a karaoke show is that the venue hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

11.     Generally, a "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information.  The graphical component is synchronized to the music and is displayed to the patron who is performing and, typically, to the crowd as well.

12.     Venues that offer karaoke entertainment do so primarily as a free service, but with the commercial purpose of enticing patrons to come to their establishments and purchase food and beverages.

13.     The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

14.     PEP is the owner of Sound Choice, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

15.     PEP has succeeded Slep-Tone Entertainment Corporation ("Slep-Tone"), by assignment, in all interest in the Sound Choice brand.

16.     Over the course of nearly three decades in business, Slep-Tone re-recorded and released in excess of 16,500 Sound Choice-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics").

17.     Sound Choice-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers.  According to some estimates, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

18.     The popularity of Sound Choice karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

19.     Sound Choice karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

20.     Slep-Tone and its successor PEP have released their karaoke tracks for commercial users only on compact discs[1] and not on any other form of carrier (such as computer hard drives or through internet downloads).

21.     Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the Sound Choice CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

---

[1] In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

22.     In most cases, the creation of such non-original tracks results in an imitation of a Sound Choice track, which imitation is inferior to the original because of digital compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

23.     In a typical bar or restaurant environment, because the imitation tracks still bear the Sound Choice trademarks, when the tracks are used, the Sound Choice trademarks are broadcast or published to the general public or specific market segment to advertise the establishment's goods, products or services for the purpose of attracting customers or supporters.

24.     In a typical bar or restaurant environment, patrons are often unable to distinguish the imitation from an original, provided that the compression is not too aggressive, because the goal is to produce an acceptable digital substitute.

25.     The process outlined above is known as "media-shifting," because the information is being copied or shifted from one medium to another, and "format-shifting," because the information is being copied or shifted from one format to another.

26.     Media-shifting and format-shifting are undertaken for a number of purposes, some reasonable and others illicit.

27.     Users of karaoke accompaniment tracks usually find that the use of media-shifted tracks provides them with greater ease of use of the content, which can be stored on a hard drive and accessed quickly without having to insert discs into a player, and can protect the user's discs from excessive wear, damage, loss, or theft.

28.     Prior to 2007, Slep-Tone prohibited media-shifting and format-shifting of its products entirely, and its products carried warnings against the unauthorized duplication that media-shifting and format-shifting require.

29. In order to enable legitimate owners of original discs the convenience of format-shifting and media-shifting, starting in 2007, Slep-Tone instituted a policy—which PEP has continued—whereby legitimate owners could gain permission for media-shifting and format-shifting.

30. That policy requires disc owners to notify Slep-Tone of their intent to media-shift, or that they have completed a media-shift.

31. That policy also requires disc owners to maintain a condition known as "1-to-1 correspondence" between the discs they own and the media (such as hard drives) to which they media-shift.

32. For example, a disc owner who wants to have two hard drives with the same media-shifted content must own two original discs representing that content.

33. The policy also requires disc owners to undergo an audit of their holdings to verify 1-to-1 correspondence and the integrity of the media-shifted tracks.

34. The policy also requires disc owners to maintain ownership and possession of the discs and to put discs from which content has been media-shifted "on the shelf," i.e., out of use of any type while the content is media-shifted.

35. Unfortunately, easy electronic duplication of media-shifted tracks has resulted in the widespread distribution of media-shifted karaoke tracks unaccompanied by the ownership of any discs at all.

36. This distribution allows karaoke accompaniment track users to gain the benefit of what appear to be Slep-Tone karaoke tracks without paying for original discs.

37. Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous

use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

38.     None of these activities are conducted with PEP's authorization, and none of these activities are accompanied by any sort of payment to PEP.

39.     Instead, these activities have driven the demand for original discs down to uneconomically feasible levels, because it has become relatively easy to obtain illicitly, for free or at a nominal cost, products that if legitimate would cost tens of thousands of dollars when purchased at retail.

40.     Prior to instituting this lawsuit, PEP sent two letters to Hogbodys via UPS on October 28, 2015. To date, Hogbodys has not provided a response. Attached as Exhibit "A" are a copy of PEP's letters to Hogbodys.

## THE RIGHTS OF THE PLAINTIFF

41.     PEP is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and properly renewed and maintained, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions." Attached as Exhibit "B" is a copy of the 'Registration No. '448. Registration No. '448 is incontestable.

42.     PEP is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and properly renewed and maintained, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions." Attached as Exhibit "C" is a copy of Registration No. '725. Registration No. '725 is incontestable.

43.   PEP is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows." Attached as Exhibit "D" is a copy of Registration No. '045.

44.   PEP is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows." Attached as Exhibit "E" is a copy of Registration No. '052.

45.   PEP has recorded its ownership of Registration Nos. '448, '725, '045, and '052 with the United States Patent and Trademark Office. Attached as Exhibit "F" is a copy of the assignment document. Attached as Exhibit "G" is a copy of the United States Patent and Trademark Office Notice of Recordation.

46.   PEP and its predecessor have, for the entire time its marks identified above ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendant, with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

47.     Principally, the Sound Choice Marks are indicators of PEP as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were made and distributed by PEP or at its direction and under its control.

48.     PEP is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress").  This distinctive and protectable trade dress includes, at a minimum, (1) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (2) the Sound Choice Marks; and (3) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

49.     PEP and its predecessor have used its trade dress continuously and substantially exclusively for a period of decades.

50.     The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of PEP and its predecessor as a source, effectively functioning as a visual trademark.

51.     The aforementioned trade dress serves to distinguish PEP's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by this Defendant are capable of identifying a particular karaoke track as originating with PEP simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

52.     The elements of the Trade Dress represent specific design choices by the Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

53.     No competitor of PEP is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of PEP's known competitors are known to use other trade dress in accomplishing the lyric cueing.

## ACTIVITIES OF DEFENDANT SHAMBURGER

54.     Shamburger provides karaoke services to various venues in Florida, including Hogbodys.

55.     On information and belief, in order to provide services, rather than using original karaoke discs that she possesses (if she indeed possesses such discs), Shamburger relies upon one or more computer hard drives that stores files representing karaoke accompaniment tracks.

56.     On information and believe, Shamburger relies upon at least one such computer hard drive described in paragraph 55 herein.

57.     On information and belief, Shamburger created, or directed another to create, or otherwise acquired from a third party the files that are stored on Shamburger's computer hard drive(s).

58.     Shamburger did not pay any royalties or fees to PEP for the privilege of displaying the Sound Choice Marks during karaoke shows.

59.     On information and belief, Shamburger does not maintain a 1:1 correspondence relationship between her hard drives and original discs she has lawfully acquired, if she indeed has any original discs.

60.     PEP did not authorize, cause, control, or know about the creation of the files stored on Shamburger's computer hard drives at the time those files were so stored.

61.     Rather, on information and belief, the files were created by or at the behest of Shamburger, or by a third party unknown to PEP.  The party who created the files is the "origin" of the files for purposes of the Trademark Act.

62.     On information and belief, many of the files stored on Shamburger's computer hard drive are representative of karaoke tracks originally created by PEP and its predecessor and are marked with the Sound Choice Marks.

63.     When played as intended using appropriate software, those files cause the Sound Choice Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

64.     PEP did not authorize Shamburger to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks or the Trade Dress.

65.     As such, the placement of the Sound Choice Marks and the Trade Dress upon Shamburger's self-created computer files is a false designation of the origin of those computer files.

66.     At all times relevant to the causes of action stated herein, Shamburger has known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks and/or the Trade Dress is not authorized.

67.     Shamburger's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine Sound Choice-branded tracks.

68.     A patron or unwitting customer of Hogbodys, when confronted with the display of the Sound Choice Marks and the Trade Dress at one of Shamburger's shows, is likely to be confused into believing, falsely, that PEP created the tracks in use or authorized her creation.

69.     On information and belief, Shamburger's activities are not isolated or sporadic occurrences, but are instead activities which have been undertaken regularly for several years.

70.     Shamburger's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because they are paid to provide access to and play those computer files and tracks at karaoke shows.

71.     Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show are commercial acts for which Shamburger is compensated and which inure to their benefit.

72.     On information and belief, Shamburger's piracy of accompaniment tracks are not limited to PEP's tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

73.     PEP's marks were displayed on video monitors during various songs played by Shamburger.

74.     Shamburger's uses of PEP's marks are not authorized.

## ACTIVITIES OF DEFENDANT HOGBODYS

75.     Hogbodys hired Shamburger to provide commercial karaoke services at its bar.

76.     Hogbodys has the right and ability to control whether its contractors use authentic or counterfeit materials to provide services.

77.     PEP informed Hogbodys of the infringing and counterfeit character of Hogbodys' contractor's karaoke accompaniment tracks.

78.     PEP offered Hogbodys the opportunity to enter into its Verified Compliance Safe Harbor Program, which is a free program that protects a venue from liability for the acts of its contractors in exchange for requiring its contractors to provide information about their karaoke systems to enable PEP to assess whether those contractors are operating legally.

79.     PEP also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials.

80.     As a result of PEP's efforts, Hogbodys has actual knowledge of the infringing and counterfeit nature of Shamburger's karaoke materials.

81.     Despite that knowledge, Hogbodys refused to terminate Shamburger's services.

82.     Despite that knowledge, Hogbodys continued to receive financial benefit from the provision of infringing karaoke services at its establishment by Shamburger, through the attraction of paying patrons to its establishment.

83.     As such, Hogbodys operated in actual or apparent partnership with Shamburger, in a symbiotic relationship from which Shamburger and Hogbodys benefit.

84.     Hogbodys has also advertised its karaoke services, which services include the unlawful use of the Sound Choice Marks.

85.     Hogbodys is liable for the acts of trademark infringement directly engaged in by Shamburger on its respective premises or for its benefit.

## DAMAGES

86.     Shamburger's unauthorized use of PEP's trademarks has damaged PEP. Shamburger has enjoyed years of revenues attributable in substantial part to her use of counterfeit branded karaoke tracks to provide karaoke services for money.

87.     Shamburger's illicit activities have also allowed her to compete unfairly against PEP's legitimate customers by lowering her cost of doing business through piracy of the music materials she uses.

88.     Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which Shamburger operates by helping to crowd higher-cost but legitimate operators out of the market.

89.     Shamburger's acts deprived PEP of revenue by discouraging legitimate operators from investing in legitimate Sound Choice branded products.

90.     Shamburger's unauthorized use of and benefit from the Sound Choice marks has damaged PEP both in the aggregate and individually.

91.     Defendants have damaged PEP in an amount of at least $100,000.00.

92.     Moreover, by exerting illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the use of pirated material belonging to PEP, the Defendants have cost PEP in excess of $100,000.00 in revenue from legitimate sources crowded out of the market by the Defendants' piracy.

### FIRST CLAIM FOR RELIEF
### TRADEMARK AND TRADE DRESS INFRINGEMENT
### AGAINST DEFENDANT SHAMBURGER (Lanham Act)

93.     PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 92 above.

94.     Shamburger used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by

displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

95.     Shamburger's use of the Sound Choice Marks and the Trade Dress was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

96.     PEP did not license Shamburger to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the Sound Choice Marks or the Trade Dress in connection with the provision of her services.

97.     Use of the Sound Choice Marks and the Trade Dress by Shamburger in this manner is likely to cause confusion, or to cause mistake, or to deceive its customers and patrons into believing that its services are being provided with the authorization of PEP and that its music libraries contain bona fide Sound Choice accompaniment tracks.

98.     On information and belief, the acts of Shamburger were willful, knowing, and intentional.

99.     PEP has been damaged by the infringing activities of Shamburger.

100.    Unless enjoined by the Court, Shamburger's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

**SECOND CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**
**AGAINST DEFENDANT SHAMBURGER**

101.    PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 92 above.

102.    On each occasion Shamburger caused or permitted an unauthorized counterfeit duplicate of a PEP accompaniment track to be played during a karaoke show at a given

establishment, the Sound Choice Marks and the Trade Dress were displayed in connection with Shamburger's karaoke services.

103.    The display of the Sound Choice Marks and the Trade Dress is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP manufactured the karaoke accompaniment tracks in use at the establishment or otherwise sponsored or approved Shamburger's karaoke entertainment services.

104.    The display of the Sound Choice Marks and the Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the tracks being performed were sold by PEP and purchased or otherwise licensed by Shamburger.

105.    Shamburger's use of PEP's marks and trade dress in this fashion or in a more appropriate fashion would have inured to the benefit of PEP if Shamburger had legitimately acquired bona fide original media instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

106.    Because PEP has been denied this revenue, it has been damaged by Shamburger's uses.

107.    On each occasion when Shamburger caused or permitted an accompaniment track pirated from a manufacturer other than PEP to be played during a karaoke show, the words, names, and symbols of the other manufacturer were displayed in connection with Shamburger's karaoke entertainment services.

108.    The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be

deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Shamburger acquired in a legitimate manner.

109.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the tracks being performed were sold by those manufacturers and purchased by Shamburger.

110.    Shamburger's use of the false designations of origin in this fashion damages PEP by enabling Defendants to provide karaoke services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers, can provide or obtain them.

111.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

112.    Because PEP has been denied this revenue, it has been damaged by Shamburger's false designations of origin relating to other manufacturers.

113.    Unless enjoined by the Court, Shamburger's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES**
**ACT (FDUTPA) Fla. Stat. §501.201, *et seq.* AGAINST DEFENDANT SHAMBURGER**

114.    PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 92 above.

115.    Shamburger used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the

reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

116.    Shamburger's acts of infringement occurred during the conduct of trade or commerce, from which Shamburger derived an economic benefit.

117.    Shamburger's acts of infringement constitute unfair or deceptive acts or practices within the meaning of Fla. Stat. § 501.204(1) (2009).

118.    Shamburger's acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

119.    As a direct and proximate result of each of Shamburger's acts of infringement PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Shamburger's acts in creating or acquiring counterfeits of Sound Choice-branded accompaniment tracks.

120.    Unless enjoined by the Court, Shamburger's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

121.    PEP is entitled to its attorneys' fees and costs pursuant to Fla. Stat. §501.2105.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**AGAINST DEFENDANT SHAMBURGER**

122.    PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 92 above.

123.    Shamburger used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection

with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

124.    Shamburger's use of the Sound Choice Marks and the Trade Dress is business conduct which is contrary to honest practice in commercial matters.

125.    PEP did not license Shamburger to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks or the Trade Dress in connection with the services provided at its commercial establishment.

126.    Use of the Sound Choice Marks and the Trade Dress in the manner attributable to Shamburger is likely to cause confusion, or to cause mistake, or to deceive customers at the venue in which Shamburger performs into falsely believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

127.    Shamburger's acts are willful and knowing.

128.    PEP has been damaged by the infringing activities of Shamburger.

129.    Unless enjoined by the Court, Shamburger's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

## FIFTH CLAIM FOR RELIEF
### TRADEMARK AND TRADE DRESS INFRINGEMENT
### AGAINST DEFENDANT HOGBODYS (Lanham Act)

130.    PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 92 above.

131.   Hogbodys used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by allowing and permitting the display of the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

132.   Hogbodys' use of the Sound Choice Marks and the Trade Dress was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

133.   PEP did not license Hogbodys to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the Sound Choice Marks or the Trade Dress in connection with the provision of its services.

134.   Use of the Sound Choice Marks and the Trade Dress by Hogbodys in this manner is likely to cause confusion, or to cause mistake, or to deceive its customers and patrons into believing that its services are being provided with the authorization of PEP and that its music libraries contain bona fide Sound Choice accompaniment tracks.

135.   On information and belief, the acts of Hogbodys were willful, knowing, and intentional.

136.   PEP has been damaged by the infringing activities of Hogbodys.

137.   Unless enjoined by the Court, Hogbodys' infringing activities as described above will continue unabated and will continue to cause harm to PEP.

### SIXTH CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
### AGAINST DEFENDANT HOGBODYS

138.   PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 92 above.

139.   On each occasion when Hogbodys permitted a Sound Choice-branded accompaniment track to be played during a karaoke show, Hogbodys permitted the display of the Sound Choice marks in connection with Shamburger's karaoke entertainment services.

140.   The display of the Sound Choice marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved Hogbodys' services and commercial activities.

141.   The display of the Sound Choice marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the tracks being performed were sold by PEP and purchased by Shamburger for providing karaoke entertainment services in a venue of Hogbodys'.

142.   Hogbodys' use of the Sound Choice marks in this fashion would have inured to the benefit of PEP if Shamburger had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

143.   Because PEP has been denied this revenue, it has been damaged by Hogbodys' uses.

144.   On each occasion when Hogbodys permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, Hogbodys permitted the display of the words, names, and symbols of the other manufacturer in connection with Shamburger's karaoke entertainment services.

145.   The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be

deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Shamburger acquired in a legitimate manner.

146.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the tracks being performed were sold by those manufactures and purchased by Shamburger.

147.    Hogbodys' use of the false designations of origin in this fashion damages PEP by enabling Hogbodys, through Shamburger, to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

148.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

149.    Because PEP has been denied this revenue, it has been damaged by Hogbodys' false designations of origin relating to other manufacturers.

150.    Unless enjoined by the Court, Hogbodys' unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA) Fla. Stat. §501.201, *et seq*. AGAINST DEFENDANT HOGBODYS**

151.    PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 92 above.

152.    Hogbodys hired Shamburger to provide commercial karaoke services at its establishment, and they had the right and ability to control her use of authorized or counterfeit materials for said commercial purposes.

153.    Hogbodys permitted Shamburger to engage in acts of infringement of the Sound Choice marks and the Trade Dress, in derogation of PEP's common law and statutory rights in those marks.

154.    Shamburger's acts of infringement occurred during the conduct of trade or commerce, from which Hogbodys derived economic benefit.

155.    Hogbodys enabling Shamburger's acts of infringement constitute unfair or deceptive acts or practices within the meaning of Fla. Stat. § 501.204(1) (2009).

156.    Hogbodys enabling Shamburger's acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

157.    As a direct and proximate result of each of Shamburger's acts of infringement and Hogbodys' encouragement thereof, PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Shamburger's acts in creating or acquiring counterfeits of Sound Choice-branded accompaniment tracks.

158.    As such, PEP has been damaged and is likely to encounter further damages by the deceptive trade practices of Shamburger, aided by Hogbodys' encouragement, within the meaning of Fla. Stat. § 501.204(1) (2009).

159.    Unless enjoined by the Court, Shamburger's unfair competition activities, aided by Hogbodys' encouragement, as described above will continue unabated and will continue to cause harm to PEP.

## EIGHTH CLAIM FOR RELIEF
## COMMON LAW UNFAIR COMPETITION
## AGAINST DEFENDANT HOGBODYS

160.    PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 92 above.

161.    On each occasion when Hogbodys permitted a Sound Choice-branded accompaniment track to be played during a karaoke show, Hogbodys permitted the display of the Sound Choice marks in connection with Shamburger's karaoke entertainment services.

162.    The display of the Sound Choice marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved Hogbodys' services and commercial activities.

163.    The display of the Sound Choice marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the tracks being performed were sold by PEP and purchased by Shamburger for us in provided karaoke entertainment services in a venue of Hogbodys'.

164.    Hogbodys' use of the Sound Choice marks in this fashion would have inured to the benefit of PEP if Shamburger had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

165.    Because PEP has been denied this revenue, it has been damaged by Hogbodys' uses.

166.    On each occasion when Hogbodys permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, Hogbodys permitted the display of the words, names, and symbols of another manufacturer in connection with Shamburger's karaoke entertainment services.

167.    The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Shamburger acquired in a legitimate manner.

168.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the tracks being performed were sold by those manufactures and purchased by Shamburger.

169.    Hogbodys' use of the false designations or origin in this fashion damages PEP by enabling Hogbodys, through Shamburger, to provide karaoke entertainment services at a lower cost than persons who acquired those materials legitimately, including PEP's legitimate customers.

170.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus denial of revenue to PEP.

171.    Because PEP has been denied this revenue, it has been damaged by Hogbodys' false designations.

172.   Unless enjoined by the Court, Hogbodys' unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, PEP, prays for judgment against the Defendants, and that the Court:

A.     Find that Defendants committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B.     Find that Defendants engaged in unfair competition detrimental to PEP in violation of 15 U.S.C. § 1125(a);

C.     Enter judgment against Defendants and in favor of PEP on all applicable counts;

D.     Find the Defendants' activities were in all respects conducted willfully and for profit;

E.     Award to PEP Defendants' profits and the damages sustained by PEP because of Defendants' conduct in infringing the Sound Choice Marks, the Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting in an amount up to Two Million and no/100 Dollars ($2,000,000.00) per mark infringed and in any event in an amount not less than Twenty Five Thousand and no/100 Dollars ($25,000.00) for each karaoke system operated by Defendants, and not less than Fifty Thousand and no/100 Dollars ($50,000.00) for each establishment in which the infringement occurred;

F.     Award to PEP Defendants' profits and the damages sustained by PEP because of the Defendants' acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $25,000.00 for each karaoke system operated by Defendants, and not less than $50,000.00 for each establishment in which the infringement occurred;

G.      Award to PEP treble, punitive, or otherwise enhanced damages, as available, for Defendant's acts of willful infringement;

H.      Order all computer disks, drives, or other media belonging to Defendants, which media contain counterfeits of PEP's marks, or of marks belonging to other manufacturers, to be delivered up for destruction;

I.      Grant PEP preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by Defendants;

J.      Grant PEP preliminary and permanent injunctive relief against further false designations of origin by Defendants with respect to words, names, and symbols associated with other manufacturers;

K.      Award PEP its costs suit and attorney fees, to the extent not awarded above; and

L.      Grant PEP such other and further relief as justice may require.

**JURY DEMAND**

PEP demands trial by jury on all issues so triable.

Date: February  /  , 2016

                                        Respectfully submitted,

                                        /s/
                                        Woodrow H. Pollack
                                        Trial Counsel
                                        Florida Bar No. 026802
                                        **GRAYROBINSON, P.A.**
                                        401 East Jackson Street, Suite 2700
                                        Tampa, Florida  33602
                                        (813) 273-5000
                                        (813) 273-5145 (facsimile)
                                        woodrow.pollack@gray-robinson.com
                                        *Attorney for Plaintiff*